DECISION
This is an appeal by defendant-appellant, Shelly Sheree Branche, from a judgment of the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of involuntary manslaughter and a firearm specification.
On October 5, 1999, defendant was indicted on one count of murder in violation of R.C. 2903.02. The indictment arose out of the shooting death of Darrell Chillous on September 26, 1999.
The matter came for trial before a jury beginning on January 9, 2001. The evidence indicated that defendant and the shooting victim lived together at a residence located at 1204 East 21st Avenue. Plaintiff-appellee, the state's theory of the case was that defendant had been jealous of attention Chillous was receiving from other women, and that on the night of the incident defendant was angry at Chillous because he had been to a party and he had not returned her pager messages sent that evening.
On September 26, 1999, Columbus Police Officer David Myers was dispatched to 1204 East 21st Avenue after receiving information regarding a shooting. When the officer arrived at the address, a female, identified at trial as defendant, was sitting on the front porch. Officer Myers approached defendant and asked, "did you shoot your boyfriend?" (Tr. at 20.) Defendant responded, "yes." (Tr. at 20.) The officer then asked her where the weapon was located, and she stated that she had "dropped it on the bedroom floor." (Tr. at 20.) Officer Myers testified that defendant did not have any bruising or cuts that evening. Officer Myers subsequently entered the residence and observed the victim "laying on the bed convulsing." (Tr. at 21.)
Columbus Police Officer Theodore Owens was also dispatched to the scene, and he accompanied defendant to police headquarters along with another officer. Officer Owens did not observe blood or any cuts or bruises on defendant.
The victim had been shot once in the mouth area, and when paramedics arrived he was breathing slowly. Chillous was transported to Ohio State University Hospital, where he was subsequently pronounced dead.
Columbus Police Officer Rhonda McLaughlin placed defendant in custody at the scene. Defendant made a statement to the officer at the time. Specifically, Officer McLaughlin testified as follows:
 She stated to me that she thought the safety was on the gun, and that they were arguing. He pushed her down on the bed and as she was coming down on the bed, she reached out and grabbed a handgun that was on the night stand. And as they were struggling, he was pinning her down. She was struggling to get up and the gun went off. She said something about how she was trying to leave the house because she didn't want to argue anymore. (Tr. at 75.)
Columbus Police Detective Kathie Clark arrived at the scene and questioned neighbors about whether they had heard anything prior to the shooting. One of the neighbors indicated that an argument had taken place.
Police officers collected a firearm at the crime scene. The weapon was found underneath a television set. A shell casing was in the ejection port of the weapon.
Columbus Police Detective Kevin Jackson is a member of the crime scene search unit. On the date of the incident, Detective Jackson took photographs of defendant at police headquarters. Detective Jackson did not observe any injuries to defendant at the time except for a scratch on her upper right arm. A gunshot residue test was performed on defendant.
Mark J. Hardy, a criminalist with the Columbus Police Department, examined the state's exhibit No. 16-A, a firearm. He testified that it would require seven pounds of force to discharge the weapon. Hardy also stated that the weapon would have to be "in the cocked position" before it could be fired. (Tr. at 161.) According to Hardy, in order to "chamber a round of ammunition and cock the weapon, one must then pull back on the slide [and] allow it to slam forward," thereby transferring a live round of ammunition from the magazine into the chamber. (Tr. at 161.) Hardy stated that if the weapon had been previously cocked with a live chamber in the barrel, it could be fired at that point simply by pulling the trigger. On this particular weapon, the safety was not functional, and a spent shell casing was jammed in the ejection port. On cross-examination, Hardy stated that one reason a shell casing might jam would be if the individual firing the weapon did not have a firm grip on the weapon.
Dr. Keith N. Norton, a forensic pathologist with the Franklin County Coroner's Office, performed an autopsy on the shooting victim. Chillous suffered a gunshot wound to his face, near the right upper lip and just below his right nostril. Dr. Norton observed gunpowder residue near the wound, indicating that the firearm was "not more than 40 inches away from the victim." (Tr. at 184.) The bullet went through the victim's maxillary sinus and into the temporal lobe, eventually lodging in the back of his brain. Dr. Norton opined that the cause of the victim's death was "the close range gunshot wound to the face with resultant injury to the skull and brain and bleeding into the airway." (Tr. at 189.)
On cross-examination, Dr. Norton stated that a toxicology report performed on the victim indicated that 0.16 grams percent ethanol was detected in the victim's blood. The report also revealed delta 9-tetrahydrocannabinol acid in the victim's blood. Dr. Norton stated that at some point the victim had been drinking alcohol and smoking marijuana.
Columbus Police Officer James Gravett was involved in the shooting investigation with his partner, Officer James McClary. The officers interviewed defendant, who told the officers that she and Chillous were involved in an argument in the upstairs bedroom. Chillous pushed defendant onto her bed, and "upon falling on the bed, she grabbed that handgun which was on a night stand." (Tr. at 200.) She stated that she grabbed the gun with her right hand as she was falling onto the bed. Defendant further related that, as she was on the bed, "Chillous had gotten on top of her, and upon pushing her he had pinned her left hand, left arm onto the bed and pushed her right arm down, and she stated that caused the gun to discharge." (Tr. at 200-201.) After the weapon discharged, the victim "fell off to the side," and defendant then dialed 9-1-1. (Tr. at 201.)
Jerome Moten is an uncle of the shooting victim, Chillous, and Moten is acquainted with defendant. Moten testified that Chillous had a weapon, and that at one time Chillous gave the weapon to Moten for safekeeping because of a "mis-understanding" between defendant and Chillous. (Tr. at 212.) Moten described the cause of the conflict between Chillous and defendant as "jealousness." (Tr. at 211.) Approximately two weeks before the shooting incident, Moten gave the weapon back to Chillous. According to Moten, Chillous always kept the weapon in the kitchen "on the top shelf by the refrigerator." (Tr. at 212.) The shelf was "real high," and someone wishing to reach the shelf was required to use a chair. (Tr. at 214.) Moten also stated that the weapon was kept in a holster, and that the firearm was never loaded. The bullets were "kept on the side of the holster" in an elastic piece. (Tr. at 213.) Moten was in Chillous's residence shortly after the shooting, and he observed the kitchen chair "in front of where the gun was up on the shelf." (Tr. at 215.)
On the date of the shooting, Chillous was at Moten's residence earlier that day because Chillous and defendant "had had a misunderstanding." (Tr. at 216.) During that time, defendant "went around the corner to her friend's house." (Tr. at 216.) Chillous remained at Moten's residence that evening until approximately 9:00 p.m. Moten smoked a "marijuana joint with [Chillous] before he left." (Tr. at 217.) Chillous went to a party after leaving Moten's residence.
Moten testified that he and defendant had discussed her jealousy toward Chillous prior to the incident. Approximately one week before the shooting, defendant told Moten that she was "going to kill him and them bitches if they keep on calling her house." (Tr. at 218.)
Stipulations were entered between the parties that a gunshot residue report indicated that there was residue on defendant's left hand. The parties also stipulated to the fact that a lab report did not reveal defendant's fingerprints on the magazine of the weapon.
Defendant testified on her own behalf. Defendant and the shooting victim had lived together for approximately one and one-half years. On the date of the incident, at approximately 9:00 p.m., defendant was visiting a friend, Michelle Edmundson, at the Rosemont Apartments. Defendant returned to her residence between 10:00 and 10:30 p.m. Chillous arrived home that evening between 11:30 p.m. and midnight.
Defendant gave the following account of the events leading to the death of Chillous:
 He came in the door, he came upstairs to the back bedroom hollering and fussing at me about not going with him to a party that I had told him earlier that day I was going to go with him to. He got angry with me all over again. And I told him that I wasn't going to argue with him anymore, and I was going to leave the house.
 And as I went into the bedroom to change my clothes to leave, he grabbed me by my arm and I yanked away from him and started putting on my clothes. And he took his hand and pushed me by my face onto the floor. I got up and told him that I was leaving again, and he started shoving me into the walls.
 I finally made it to the bedroom door to go downstairs and he shoved me into the wall, the wall where the bedroom door is. And when he shoved me, I fell backwards going back further into the bedroom. Everytime I tried to get up, he would shove me down again. I got between the bed and the chair, and as I was standing up, he pushed me down onto pushing me down onto the bed.
 As I fell, I grabbed the gun off the night stand. When I got up up on the bed again, Darrell fell on top of me. He had me pinned down to the bed. I went to raise the gun to hit him, he wouldn't get off me so I could leave, and he hit my arm and the gun went off. He fell off he fell over onto the bed. And I got up and I called 911 and was on the phone with the 911 operator until the police arrived. (Tr. at 245-246.)
Defendant stated that she had a bruise on her chest as a result of Chillous's actions, and that she also received a scratch on her arm from Chillous pushing her down. She denied making a statement to Moten that she was going to kill Chillous or others if they did not stop calling, and she denied that Chillous kept the weapon used in the shooting in a kitchen cabinet downstairs. Defendant stated that they lived in a high crime neighborhood, and that the weapon was for protection. Defendant indicated that she is right-handed, and she denied that she tried to fire the weapon or shoot Chillous that evening.
On cross-examination, defendant stated that sometime after Chillous arrived home on the date of the incident he placed the weapon on the nightstand in the bedroom. She denied that she ever was angry or jealous when other individuals paged Chillous. Defendant acknowledged that she had paged Chillous three times earlier that evening and that he had not called her back.
She further acknowledged that, although she told the detective that she grabbed the weapon as she fell on the bed, she actually obtained the weapon when she initially fell on the floor. Defendant could not remember how she fell across the bed. When she made her statement to the police, defendant thought the weapon was in her right hand. At trial, she thought the weapon was likely in her left hand. Defendant could not remember her finger ever being on the trigger.
The jury was charged as to the elements of murder, as well as the elements of the lesser-included offense of involuntary manslaughter. Following deliberations, the jury found defendant not guilty of murder, but guilty of the lesser-included offense of involuntary manslaughter as a proximate result of defendant attempting to commit felonious assault. The jury also found defendant guilty of the weapon specification.
On appeal, defendant sets forth the following two assignments of error for review:
 ASSIGNMENT OF ERROR I THE TRIAL COURT ERRED WHEN IT ENTERED JUDG-MENT AGAINST THE DEFENDANT, WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CON-VICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR II
Part A
 APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMEND-MENT TO THE UNITED STATES CONSTITUTION, SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION, BY TRIAL COUNSEL'S FAILURE TO REQUEST A JURY INSTRUCTION ON THE USE OF A FIREARM AS A NON- DEADLY WEAPON FOR SELF DEFENSE, WHEN SUCH WAS SUPPORTED BY THE FACTS ADDUCED AT TRIAL.
Part B
 APPELLANT WAS ALSO DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS, BY TRIAL COUNSEL'S FAILURE TO RAISE THE DEFENSE OF SELF DEFENSE AND SUBSEQUENT ACCIDENTAL DEATH, ALONG WITH THE ACCOMPANYING JURY INSTRUC-TIONS FOR SUCH DEFENSES, WHEN FACTS PRO-DUCED AT TRIAL SUPPORTED THE GIVING OF SUCH INSTRUCTION.
Under her first assignment of error, defendant challenges both the sufficiency and weight of the evidence supporting her conviction for involuntary manslaughter.
In State v. Martin (Apr. 19, 2001), Franklin App. No. 00AP-836, unreported, this court noted the separate standards of review for sufficiency and weight of the evidence:
 * * * In determining the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." * * * However, "[u]nlike a challenge to the sufficiency of the evidence, which attacks the adequacy of the evidence presented, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented." * * * When reviewing the manifest weight of the evidence, an appellate court sits as a thirteenth juror; the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of all witnesses and determines whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. * * * Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." * * *
As noted, defendant was convicted of involuntary manslaughter, the essential elements of which are that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A).[1] Under the facts of this case, in order to convict defendant of involuntary manslaughter the state was required to prove that the victim's death was the proximate result of defendant committing or attempting to commit the offense of felonious assault. The offense of felonious assault is defined under R.C. 2903.11 as knowingly causing serious physical harm to another, or knowingly causing or attempting to cause physical harm to another by means of a deadly weapon or dangerous ordnance. A "deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).
Defendant's main contention is that, during the confrontation with Chillous, her intent was to use the firearm as a nondeadly weapon to assist her in escaping from Chillous. Defendant argues that there was insufficient evidence to support the conclusion that she was in the process of committing a felony when the gun discharged and killed Chillous. Defendant further contends, under her challenge to the sufficiency of the evidence, plain error occurred because the trial court did not instruct the jury as to the use of a firearm as a nonlethal weapon. Upon review, we find defendant's contentions to be without merit.
A jury is "entitled to infer the deadly nature of an instrument from the facts and circumstances of its use." State v. McKnight (Feb. 5, 1996), Stark App. No. 1995CA00241, unreported. In State v. Marshall (1978), 61 Ohio App.2d 84, 86, this court held that "[t]he test of a deadly weapon is whether it is capable of inflicting death," and "[t]he actual use of the weapon doesn't require the same means for which it was designed." Thus, it has been held that "[a] toy gun is capable of inflicting death because of its possible use as a bludgeon." McKnight, supra., citing State v. Hicks (1984), 14 Ohio App.3d 25, 26. It has also been held that "[a]n inoperable gun can still be considered a deadly weapon * * * if it can be used as a bludgeon." State v. Edwards (Oct. 29, 1992), Cuyahoga App. No. 61215, unreported.
In the present case, defendant testified that she raised the weapon "to hit him." (Tr. at 246.) As noted by the state, this admission would constitute the offense of felonious assault, as defendant's use or attempted use of the weapon was done in a manner capable of causing physical harm. Further, the weapon at issue was operable and in fact discharged, causing the death of the victim. Under the facts of this case, in which a loaded firearm was used in a manner capable of causing physical harm, and where such firearm discharged resulting in the death of the victim, we find unpersuasive defendant's contention that it was plain error for the trial court not to give an instruction on the use of a firearm as a nondeadly weapon. Here, construing the evidence most strongly in favor of the state, as we are required to do in considering a challenge to the sufficiency of the evidence, the state presented sufficient evidence to prove that defendant caused the death of Chillous as a result of committing or attempting to commit a felonious assault.
As noted, defendant also challenges her conviction as against the manifest weight of the evidence. In the present case, the trier of fact was faced with resolving issues of credibility and conflicting evidence. The state presented evidence that defendant was jealous about calls made to the house from other women, and that defendant had in the past threatened to "kill [Chillous] and them bitches if they keep on calling her house." (Tr. at 218.) Defendant denied telling the victim's uncle, Moten, that she made threats against Chillous if the women did not stop making calls to the house. Moten testified that he was asked to keep Chillous's firearm on different occasions because Chillous did not want a weapon in the house. Defendant indicated that she had "no idea" why Chillous gave the weapon to his uncle, Moten, to keep on different occasions. (Tr. at 267.) There was also conflicting evidence about where Chillous kept the weapon at his residence. Moten testified that Chillous did not keep the weapon on the nightstand, but instead kept it on a shelf in the downstairs kitchen. Moten also stated that Chillous did not keep the weapon loaded in the house. Defendant, on the other hand, testified that Chillous "never put the gun in the kitchen cabinet," and she stated that he kept the weapon loaded. (Tr. at 258.)
Defendant acknowledged that she paged Chillous three times on the night of the incident during the time Chillous was at a party. She indicated that Chillous did not return her calls, but she stated that she was not angry with him. She also denied ever being angry when Chillous received pages from other individuals. The jury heard evidence that defendant told police detectives that she was holding the weapon in her right hand when it fired. However, gunshot residue tests indicated that there was residue on defendant's left hand and not on her right hand. At trial, defendant stated that she now believed the weapon "was in my left [hand]." (Tr. at 274.) As noted by the state, despite the fact that the victim bled profusely from the wound, and defendant testified that the victim was on top of her on the bed at the time the weapon fired, there was no evidence of any blood on defendant's clothes that evening.
In the present case, the trial court instructed the jury as to the offenses of murder, involuntary manslaughter based on felonious assault, and involuntary manslaughter based on misdemeanor assault. As previously noted, by defendant's own admission, she attempted to strike the victim with a loaded weapon during the incident. The state presented evidence indicating that defendant was jealous and angry because other women had called the victim at their residence, and that defendant had made threats against Chillous. While defendant presented a differing version of the facts, the jury appears to have afforded little weight to defendant's testimony that she was never angry or jealous toward Chillous. To the extent that the jury apparently believed the testimony of Moten over that of defendant, it was within the province of the jury to decide issues of credibility and conflicting evidence. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Based upon our review of the evidence, we do not find that the jury lost its way in finding that defendant caused the death of the victim as a proximate result of committing or attempting to commit felonious assault. Consequently, we do not find that defendant's conviction was against the manifest weight of the evidence.
Based upon the foregoing, defendant's first assignment of error is without merit and is overruled.
Under her second assignment of error, defendant contends that she was denied her right to effective assistance of counsel. Specifically, defendant argues that her counsel was deficient in failing to request a jury instruction to clarify that a deadly weapon can be used as a "non-lethal" weapon. Defendant also contends that the facts at trial supported a theory that she was acting in self-defense, and that her trial counsel was deficient in failing to request a self-defense instruction.
In order for a criminal defendant to prevail on a claim of ineffective assistance of counsel, he or she must satisfy the two-prong test set forth by the United States Supreme Court in Strickland v. Washington (1984), 466 U.S. 668. Under the first prong, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. Under the second prong of the Strickland test, a defendant is required to establish prejudice arising from trial counsel's performance. Id.
Regarding defendant's claim that her trial counsel was ineffective in failing to request a jury instruction that a deadly weapon can be used as a "non-lethal" weapon, defendant contends that the legal concept is no different than "grabbing a small cellular phone and bopping someone on the head to let them know you are serious about them leaving you alone." We disagree. We have previously held, in addressing defendant's first assignment of error, that under the facts of this case, in which defendant admitted attempting to use a loaded weapon in a manner (i.e., as a bludgeon) capable of causing physical harm, and where such weapon discharged resulting in the death of the victim, the trial court was not required to give an instruction on the use of a deadly weapon as a nonlethal weapon. Thus, defendant cannot show that trial counsel's performance was deficient in failing to request such an instruction.
We next address defendant's contention that her trial counsel was ineffective in failing to raise the defense of self-defense, and subsequent accidental death, as well as accompanying instructions on self-defense.
Under Ohio law, self-defense is an affirmative defense that an accused must prove by a preponderance of the evidence. State v. Williford (1990), 49 Ohio St.3d 247, 249. In Williford, the Ohio Supreme Court listed the following requisites to establish self-defense: (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) the accused must not have violated any duty to retreat or to avoid the danger. Id., quoting State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus.
In general, the decision whether to seek an instruction on self-defense is usually a matter of trial tactics. State v. Aria (Dec. 8, 2000), Hamilton App. No. C-990848, unreported. In the present case, defendant's theory at trial was that the shooting was accidental. Ohio courts have held that the defenses of accident and self-defense are mutually exclusive. State v. Burns (Aug. 3, 2000), Cuyahoga App. No. 69676, unreported. In State v. Barnd (1993), 85 Ohio App.3d 254, 260, the court noted that the defenses of accident and self-defense are "inconsistent by definition," as accident involves "the denial of a culpable mental state and is tantamount to the defendant not committing an unlawful act," whereas a defendant claiming self-defense "concedes he had the purpose to commit the act, but asserts that he was justified in his actions." Here, while defendant testified that she reached for the gun to hit Chillous, defendant maintained throughout her testimony that the killing was an accident, based upon her claim that the gun inadvertently fired when Chillous grabbed at her hand. Defendant specifically denied any intent to fire the weapon at Chillous to protect herself. Thus, even if trial counsel had requested an instruction on self-defense, the trial court could have concluded, under the facts, that such an instruction was not warranted.
Further, we agree with the state's contention that the evidence was insufficient to show that defendant was in imminent danger of death or great bodily harm, one of the essential elements of self-defense. While defendant testified that Chillous pushed and shoved her during the argument, defendant did not indicate that Chillous threatened her, nor did she state that she intentionally fired the weapon in an attempt to defend herself. Rather, by defendant's own testimony, the shooting was accidental, and defendant acknowledges that the trial court instructed the jury as to the definition of accident.
Under the facts of State v. Howe (July 25, 2001), Lorain App. No. 00CA007732, unreported, the defendant, Ms. Howe, and the victim, Mr. Perry, who had been involved in a romantic relationship, got into an argument. At one point, Perry sat atop Howe, and Howe scratched Perry with her fingernails in an attempt to gain her release. When Howe got up and attempted to exit the residence, Perry blocked her escape. Howe grabbed a knife and waved it at Perry. As Perry drew closer, Howe thrust the knife into Perry's chest. Howe initially told police officers that Perry had slipped and fallen on the knife, but she later changed her story and indicated that she stabbed Perry.
Following her conviction, Howe argued that she was entitled to an instruction on self-defense. The court in Howe disagreed, holding in relevant part:
 Here, Ms. Howe failed to establish a fear of imminent death or great bodily injury. She testified that she was frightened and scared. When asked if she intended to kill Mr. Perry, she responded that she did not and that it was an accident. When asked "you had absolutely no reason on that date to kill him, right?," she responded "No, not really. I really had no reason. I was just trying to get him off me, that's all. When he ran up on me — [.]" Further, when she was asked "And in fact, you're telling these ladies and gentlemen today that it wasn't really in self-defense, it was an accident. That's what you said, isn't it?" she responded that "It was an accident." Ms. Howe adduced evidence that she was frightened but not that she feared for her life or feared great bodily harm. She may have feared that he would "beat [her] up again or grab [her] or knock [her] to the floor," but none of these rise to the level of fear of great bodily injury or death. Further, "[t]he defenses of accident and self-defense are inconsistent by definition." * * *
Similarly, in the instant case, while defendant indicated that she was attempting to get Chillous off of her, she denied attempting to shoot him, and the evidence was insufficient to show that defendant "feared for her life or feared great bodily harm." Howe, supra. Finally, we note that the record indicates that trial counsel did not simply ignore the possibility of a theory of self-defense, but that counsel came to the conclusion that the facts of the case did not support all of the elements. Based upon the record in this case, we cannot conclude that trial counsel was ineffective for failing to present a self-defense theory.
Accordingly, defendant's second assignment of error is without merit and is overruled.
Based upon the foregoing, defendant's first and second assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
BOWMAN and BROWN, JJ., concur.
[1] We note that the jury was also instructed as to the elements of involuntary manslaughter under R.C. 2903.04(B), which provides in part that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree."